[No. A086999. First Dist., Div. Two. May 1, 2000.]

SUSAN SPITZER, Plaintiff and Appellant, v.
THE GOOD GUYS, INC., et al., Defendant and Respondent.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV. and V.

**COUNSEL**

Law Offices of Charles J. Wisch and Charles J. Wisch for Plaintiff and Appellant.

Jackson, Lewis, Schnitzler & Krupman, Kristin L. Cihak and Gary R. Basham for Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—Susan Spitzer appeals from the grant of summary judgment for respondent The Good Guys, Inc., her employer, in her suit alleging

disability discrimination and retaliation under the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12940 et seq.) The trial court entered judgment for respondent on the basis of findings that it "reasonably accommodated" appellant's disability and that no triable issue of material fact existed with respect to that issue or the elements of malice, oppression or fraud, which were essential to appellant's claim for punitive damages. Additionally, with respect to appellant's claim of retaliation, the court determined that appellant failed to exhaust administrative remedies and that this claim was therefore time-barred.

We find conflicts in the evidence as to whether respondent provided a reasonable accommodation and shall therefore reverse the judgment insofar as it relates to the cause of action alleging discrimination on that basis. However, we agree with the trial court that appellant's claim of retaliation is time-barred and that, because there is no evidence respondent acted with malice, oppression or fraud, appellant's claim for punitive damages must be disallowed.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Appellant began working for respondent in January 1991. Starting as a sales manager in training, she was rapidly promoted to more responsible positions. In October 1993, appellant was made store manager for respondent's store in Sunnyvale. A year later, she became store manager at its outlet at the Stonestown mall in San Francisco, one of the company's largest stores.

In 1992 appellant was diagnosed with discogenic spondylosis, a degenerative disc disease. Degeneration of the disc between her second and third lumbar vertebrae caused appellant to suffer serious chronic back pain. For several years Daniel E. Roth, M.D., the physician who treated appellant for this affliction, prescribed physical therapy and medications to alleviate her pain.

Respondent's "Floor Management Guidelines," which describe the responsibilities of store managers, require such employees, among other things, to "Be a traffic cop, make sure the right sales counselor is with the right customer," "Keep moving, create urgency, and set the pace! . . . Greet customers, welcome to the good guys! and begin rapport process . . . Manage sales process for the entire store[,] know what's going on throughout the whole store, especially outside of your department. . . . Don't leave

---

[1]Our description of the facts is, perforce, based on the materials submitted in support of and in opposition to the motion for summary judgment, which include deposition testimony of numerous persons.

the floor! Ever! . . . [and] Don't become stationary in your own department." Consistent with these directives, appellant's direct supervisor, Steve Quanstrom, testified that "the job of being a store manager is physically demanding" and requires such employees "to be on your feet a lot of the day." A "manager time study" conducted by respondent in April 1996 showed that the manager of a large store such as the one appellant managed would be required to work an average of 10.1 hours daily.

Appellant stated that, commencing in 1995, she repeatedly told management personnel she "needed accommodation due to my back disability." She had three formal discussions with Gera Vaz, respondent's vice-president of human relations, regarding her interest in reassignment. At the first meeting, on June 30, 1995, appellant told Vaz she needed a job "at corporate" because, among other things, "my back was deteriorating, and it would continue to get worse" if she remained a store manager. During one of her conversations with Vaz appellant told her "that I would wind up having to have back surgery if I didn't get off my feet on a more permanent basis." Vaz responded that appellant "should just hang in there and keep trying and that something might come up." In March 1996 appellant met again with Ms. Vaz and reiterated her interest in reassignment to a sedentary position due to her continuing back pain. Several months later appellant had a phone conversation with Vaz and once more expressed her interest in reassignment. Subsequently, appellant met with or discussed her desire for reassignment with her regional manager, Bill Graham, and numerous others in the company. For example, she told Lynn Hogarth, associate relations manager for the Stonestown store, that she was in constant and worsening pain due to the need to stand for extended periods and that it was impractical to take the periodic breaks she needed. She also told Hogarth she "needed to get a position in corporate where I could be off my feet." Appellant also communicated her constant pain and need for accommodation to Pat Zabell, "head of employee relations for the Human Resources Department."

Appellant thereafter attempted to obtain several specific positions that would have allowed her to get off her feet. In February 1996 she sought a position as corporate employment specialist, but was subsequently told the job had been "put on hold." Later that year she applied for an "MIS Systems Analyst" job and a "Store Operations/Special Projects" job, but was rejected for both positions. As directed by Gera Vaz, appellant then spoke with each of the managers of departments to which she was interested in transferring to advise them of her continuing interest. All these efforts were unavailing. According to appellant, "[f]rom May 1996 until November 1998 [shortly after this litigation commenced], I was not informed of a single such position that actually existed and was open," although she said she subsequently

learned that such positions, for which she was qualified, did in fact exist. Appellant stated that at the end of 1998, "I stopped checking the company telephone job listings because virtually all of the jobs listed were either clerical or low level administrative jobs which were not appropriate for my level of experience as a management employee. Further, as the various department managers had assured me that they would inform me of any appropriate jobs, I believed that it was not necessary to keep checking the telephone job listings."

During the last years of her employment with respondent, appellant was required to briefly leave work on two occasions due to severe back pain. In April 1996, Dr. Roth directed appellant to stop working for a while as he believed the exacerbated pain she was then experiencing was caused by the prolonged standing, walking and bending required by her job. He permitted her to return to work the following June, as she desired, but directed her to avoid standing or walking for more than two hours at a time and instructed her to take a 15- to 20-minute break before resuming work.

On April 26, 1996, appellant sent a memorandum to Gera Vaz requesting a medical leave of absence, attaching a note from Dr. Roth explaining the medical need for the leave, and stating her belief that "with accommodations, I believe that I will be able to perform my job upon my return from medical leave." The memorandum explained that appellant had a problem with mobility and that she understood that her mobility problem "may cause some concerns" with her performance as a store manager. For this reason she expressed interest in "the possibility of a transfer to a position in the corporate offices in Brisbane," mentioning specific positions in the areas of "training, recruiting and operations" she had earlier discussed with Ms. Vaz and others in the company. When appellant returned to work and her condition worsened, she increased her efforts to obtain sedentary work from respondent, as Dr. Roth advised.

When appellant returned to work she was told by Steve Quanstrom, her immediate supervisor, to do what was necessary to comply with her physician's directive to vary her activities. Quanstrom authorized her to sit in a chair on the floor of the store, but appellant concluded this was incompatible with her job responsibilities, which required "moving around and getting involved in what was going on."

Several months later, Quanstrom reduced appellant's job performance classification from "highly effective" to "effective," and reduced her "customer service" evaluation two levels, from "highly effective" to "needs improvement." On the evaluation form, Quanstrom commented that appellant "had personal issues that affected her performance at work that ultimately led to her taking six weeks off." He also questioned "whether or not

this is the right job for [appellant], given her personal situation, and if this is a facility she can handle." Quanstrom's lower evaluations resulted in the reduction of salary increases appellant would otherwise have received.

In May 1997 Dr. Roth, who was then consulting an orthopedist about appellant's increasing pain, recommended she take another medical leave, which he expected would be for a month. Shortly after this leave began, appellant discussed with John Duken the possibility of temporarily working with him at the "Hayward Call Center" he ran for respondent. Duken promised to let her know if such a position ever became available, but she never heard from him. In any case, Dr. Roth later discouraged appellant from seeking a job in Hayward, as he believed the long commute would adversely affect her back problem.

In August 1997 appellant's attorney wrote respondent, described her unsuccessful efforts to obtain an alternative position, and requested a financial settlement. Three months later respondent contacted appellant about the possibility of a corporate position as a store manager trainer. Appellant claims that position was actually available eight months earlier; according to her, respondent made no efforts to afford her that job when it became open, and did not seriously consider her for any positions she could have filled which had been or were available and would have accommodated her disability until after she obtained counsel who raised the prospect of litigation. Appellant did not pursue the possibility of a store manager trainer position and left the company in March 1998.

Respondent contends it reasonably accommodated appellant's disability by restructuring her job, so that she was permitted medical leave, periodic breaks prescribed by her physician, and the right to leave work early for physical therapy; relieving her from some of the requirements imposed on store managers; and allowing her to use a chair on the sales floor. Central to respondent's view of the case is appellant's alleged admission that, because she had been told by an attorney she had consulted that she could be fired if she did so, she never explicitly stated that she was physically unable to perform the essential functions of her job as store manager after her job was restructured.

Appellant, of course, advances a very different view of the facts. She maintains the evidence establishes that respondent was fully aware of the failure of the restructuring of her job to accommodate her back problem, and knew or should have known that her limitations could only be satisfactorily accommodated by reassigning her to a more sedentary position but failed to do so even though there were suitable vacant positions for which she was

qualified. At the very least, appellant argues, there is a triable issue as to this question.

## I.

### THE REASONABLE ACCOMMODATION REQUIREMENT OF THE FEHA

Under the FEHA it is an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" (Gov. Code, § 12940, subd. (k)), and for an employer, "because of the . . . physical disability, mental disability, medical condition . . . of any person, . . . to discharge the person from employment . . . or discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)[2]

"Employers must make reasonable accommodations to the disability of an individual unless the employer can demonstrate that doing so would impose an 'undue hardship.' (Cal. Code Regs., tit. 2, § 7293.9; *Sargent* v. *Litton Systems, Inc.* (N.D.Cal 1994) 841 F.Supp. 956, 960.) 'Reasonable accommodation may, but does not necessarily, include, nor is it limited to, such measures as: [¶] (1) Accessibility. Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; [¶] (2) Job restructuring. Job restructuring, reassignment to a vacant position, part-time or modified work schedules, acquisition or modification of equipment or devices, adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar actions.' (Cal. Code Regs., tit. 2, § 7293.9, subd. (a).)" (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 947 [62 Cal.Rptr.2d 142].)

Respondent concedes appellant has a physical disability within the meaning of the FEHA. It maintains it discharged the duty to reasonably accommodate her limitations by restructuring her job, so that she was allowed medical leaves, frequent breaks, and the right to be seated on the sales floor rather than have to constantly move around. While respondent does not claim reassignment of appellant to a vacant position for which she

---

[2]As has been stated with respect to a similar provision of the Americans with Disabilities Act (ADA) (42 U.S.C. § 12112(b)(5)(A)), "The 'reasonable accommodation' requirement may appear on the surface to constitute required preferential treatment; however, analytically this is not the case. The failure to accommodate is included within the concept of illegal discrimination, rather than having a life of its own. The significance of this, at least in theory, is that an employer is not required to offer an accommodation which does any more than place the disabled individual on an equal footing with others." (9 Larson, Employment Discrimination (2d ed. 2000) § 154.01, p. 154-2, fns. omitted.)

was qualified would impose an "undue hardship" on its operations, it claims it was unaware of the need for any such alternative accommodation. Respondent points out that the FEHA requires it to make reasonable accommodation only for the "*known* physical or mental disability of an applicant or employee." (Gov. Code, § 12940, subd. (k), italics added.) According to respondent, the continuing disability appellant allegedly suffered despite the accommodations she received were never made known to it, and therefore a duty to provide any further accommodation never arose. Respondent also argues that appellant's rejection of the major accommodation it proffered—the restructuring of her job to permit frequent breaks and the use of a chair on the sales floor—relieved it of the obligation to provide any further accommodation.

■ "Inasmuch as the FEHA and the interpretative regulations in California Code of Regulations were modeled on the federal Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990 (ADA), decisions interpreting those laws may be useful in deciding cases under the FEHA." (*Prilliman v. United Air Lines, Inc., supra*, 53 Cal.App.4th 935, 948.) Resort to federal case law is particularly appropriate in connection with the duty to make reasonable accommodation because the provisions of the state regulations defining "reasonable accommodation" under the FEHA are virtually identical to language of the ADA reiterated in the regulations implementing that federal statute. (Compare Cal. Code Regs., tit. 2, § 7293.9, subd. (a) with 42 U.S.C. § 12111(9) and 29 C.F.R. § 1630.2(o)(2) (1999).)

Although the ADA does not explicitly address the issue, the Equal Employment Opportunity Commission (EEOC), which administers the ADA, has declared that the responsibility to initiate the interactive process of fashioning an appropriate accommodation lies primarily with the employee. "If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." (EEOC Interpretive Guide, 29 C.F.R. § 1630.9 Appen. (1999).) Federal courts have adopted this principle. As stated in *Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, "it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one. If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." (*Id.* at p. 165, fn. omitted; see also *Hunt-Golliday v. Metropolitan Water* (7th Cir. 1997) 104 F.3d 1004, 1012.) An employee whose disability is not apparent is therefore obliged to tender a specific request for a necessary accommodation. (*Miller v. National Cas.*

*Co.* (8th Cir. 1995) 61 F.3d 627, 630.) As stated in *Prilliman v. United Air Lines, Inc., supra*, 53 Cal.App.4th 935, " '[t]he employee bears the burden of giving the employer notice of the disability. [Citation.] This notice then triggers the employer's burden to take "positive steps" to accommodate the employee's limitations. . . . [¶] . . . The employee, of course, retains a duty to cooperate with the employer's efforts by explaining [his or] her disability and qualifications. [Citation.] Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions.' " (*Id.* at p. 950, quoting *Goodman v. Boeing Co.* (1995) 127 Wn.2d 401 [899 P.2d 1265].)

█  The question before us is whether the trial court properly determined on motion for summary judgment that appellant failed to provide respondent notice that reassignment was necessary to reasonably accommodate her limitations.

## II.

### PRINCIPLES OF SUMMARY JUDGMENT

Summary judgment is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment bears the initial burden of proving the "cause of action has no merit" by showing that one or more elements of plaintiff's cause of action cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subd. (o)(2); *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 213 [51 Cal.Rptr.2d 642]; *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1730-1731 [35 Cal.Rptr.2d 181].) Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. (*Ibid.*)

█  "This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. (*Prilliman v. United Air Lines, Inc.*[, *supra,*] 53 Cal.App.4th 935, 951 . . . .)" (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483].) We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. (*Hersant, supra*, at p. 1001.) However, to defeat the motion for summary judgment, the plaintiff must show " 'specific facts' " and cannot rely upon the allegations of the pleadings. (*Snyder v. United States Fidelity & Guaranty Co.* (1997) 60

Cal.App.4th 561, 565 [70 Cal.Rptr.2d 498].) At the same time, we must bear in mind that, " '[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant.' " (*Benson v. Northwest Airlines, Inc.* (8th Cir. 1995) 62 F.3d 1108, 1111, quoting *Crawford v. Runyon* (8th Cir. 1994) 37 F.3d 1338, 1341.)

### III.

### TRIABLE ISSUES OF FACT EXIST AS TO WHETHER RESPONDENT FULFILLED ITS DUTY TO REASONABLY ACCOMMODATE

■ Respondent maintains it is entitled to summary judgment on appellant's cause of action for failure to reasonably accommodate, first, because she provided no evidence the restructuring of her job as store manager was inadequate to enable her to perform the essential functions of that position and, second, because respondent's duty to reasonably accommodate ended when she rejected this accommodation. The trial court accepted the first contention but appears to have rejected the second.

The order granting summary judgment states that respondent "has specifically established that it accommodated [appellant's] condition by modifying her usual position as store manager in that it told her to do what was necessary to follow her doctor's instructions concerning varying her activities, approved her request to leave early for physical therapy appointment[s], exempted her from the duty schedule a manager would normally be scheduled to keep, and suggested [appellant] put a chair on the sales floor so she could take sitting breaks." The order additionally states that "[o]nce [appellant] specifically requested reassignment in August 1997, [respondent] accommodated [appellant] by requesting that [she] apply for a management trainer position and advising [appellant] that she should continually check the job hot line. . . . [Appellant] rejected this proffered accommodation, thereby ending [respondent's] statutory obligation."

These determinations are somewhat inconsistent, because respondent would have no duty to accommodate by way of reassignment to a different position if the restructuring of her current job provided a reasonable accommodation. In any case, we conclude that neither determination is justified by the record, as triable issues are presented in connection with both. Moreover, the court's conclusion that requesting appellant "to continually check the job hotline" constitutes a "reasonable accommodation" is untenable as a matter of law.

The record is replete with evidence pertaining to the physical demands placed upon respondent's store managers as well as the manner in which appellant's disability severely restricted her ability to satisfy those demands, even after the restructuring of her job in an attempt to accommodate her disability. Though it is contested, there is also evidence appellant's supervisor, Steve Quanstrom, was aware that the restructuring of appellant's position did not succeed in enabling her to perform her job properly. For example, appellant testified that the constant demands upon a store manager required rapid response to the frequent requests of customers and other sales personnel for assistance and that, as a practical matter, it was impossible to take the breaks she was allowed. She also stated that she never actually used a chair on the floor. According to appellant, she and Quanstrom merely discussed the use of a chair on the sales floor "as an option," but that after "walk[ing] around the store and consider[ing] places where I might have been able to sit . . . we agreed during that conversation that it wasn't a practical solution." Appellant acknowledged that she requested and was granted the right to take regular 15- to 20-minute breaks and time off periodically so that she could obtain physiotherapy, but she denied that she ever represented that these measures actually accommodated her limitations, though at the time of her first medical leave in 1996 she had expressed that hope in a letter to respondent. According to appellant, at the time she asked Quanstrom for breaks and time off she also "specifically requested a job at corporate as an accommodation or to be considered for jobs at corporate." Quanstrom confirmed this account, testifying that appellant told him "she was interested in finding a position at the corporate offices where she wouldn't have to be on her feet." As earlier indicated, appellant also testified, and it is not genuinely disputed, that during the time she was allowed breaks and medical leaves she asked another manager, John Duken, for reassignment to a facility he administered, which also supports her contention that senior managers were fully aware that the restructuring of her job did not provide a reasonable accommodation and alternative measures therefore needed to be pursued.

The downgrading of appellant's job performance also tends to show respondent was aware that the restructuring of appellant's job did not accommodate her limitations. As earlier noted, Quanstrom's review of appellant's performance, which reduced her evaluation from "highly effective" to "effective," stated that appellant "needed improvement on customer service and on turnover" and that she "had personal issues that affected her performance at work that ultimately led to her taking six weeks off." Quanstrom's written evaluation reported that he had discussed with appellant "whether or not this is the right job for her, given her personal situation, and if this is a facility she can handle." Quanstrom confirmed at deposition

that his reservations about appellant related to her inability "to be on [her] feet a lot," which he considered a requirement of her position. Finally, appellant testified that at the time she took medical leave in May 1997 she was often the only store manager on duty at the Stonestown store and, due to the volume of customers, was often unable to leave the sales floor for hours at a time. It was at this time that appellant asked John Duken, the manager of respondent's Hayward Call Center, for reassignment to that facility.

Respondent's heavy reliance on a letter appellant wrote respondent stating that "with accommodations, I believe that I will be able to perform my job upon my return from medical leave" is unjustified, as this letter was written in April 1996 when she requested her first medical leave, before she could have known whether restructuring her job would enable her to perform the functions of a store manager upon her return to that position. There is evidence indicating respondent's senior managers knew this hope was never realized. It is worth pointing out, finally, that the order granting summary judgment implicitly acknowledges the evidence that respondent was or should have been aware of the inefficacy of the restructuring of appellant's job, as the order states that appellant "specifically requested reassignment in August 1997," and evidence pertinent to that and other requests shows appellant sought reassignment because of her continuing physical inability to adequately discharge the responsibilities of her job as store manager even after it was restructured. The evidence proffered by respondent does not establish it was unaware that the restructuring of appellant's job failed to reasonably accommodate her limitations.

The extent of respondent's knowledge of the failure of job restructuring to reasonably accommodate appellant, and the need to reassign her to another position, is unclear. A triable issue of fact is therefore presented.

The trial court also justified the grant of summary judgment on the cause of action alleging a failure to reasonably accommodate on the different and apparently alternative basis that, after the restructuring of appellant's job failed to accommodate her limitations, she asked for reassignment to a different position, but respondent satisfactorily "accommodated" this desire by "requesting that [she] apply for a management trainer position and advising [her] that she should continually check the job hot line."[3] This reasoning reflects a misunderstanding of the affirmative nature of the reasonable accommodation requirement.

---

[3]We characterize this as an "apparently alternative basis" for the grant of summary judgment because it is inconsistent with the primary basis of the ruling, which is that the restructuring of appellant's job reasonably accommodated her limitations. However, if that were true appellant would have no right to further accommodation and respondent no duty to facilitate reassignment.

"Numerous courts have assumed that the reassignment obligation means something more than treating a disabled employee like any other job applicant." (*Aka v. Washington Hosp. Center* (D.C. Cir. 1998) 156 F.3d 1284, 1304 [332 App.D.C. 256].) The responsibility to reassign a disabled employee who cannot be otherwise accommodated does "not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement" (*Cassidy v. Detroit Edison Co.* (6th Cir. 1998) 138 F.3d 629, 634) but it nevertheless does entail affirmative action. Courts have made it clear that "an employer has a *duty* to reassign a disabled employee if an already funded, vacant position at the same level exists." (*Mengine v. Runyon* (3d Cir. 1997) 114 F.3d 415, 419, italics added.) As stated in *Gile v. United Airlines, Inc.* (7th Cir. 1996) 95 F.3d 492, 498, "the ADA may *require* an employer to reassign a disabled employee to a different position as reasonable accommodation *where the employee can no longer perform the essential functions of their [sic] current position*." (*Id.* at p. 148, italics added; see also *Benson v. Northwest Airlines, Inc., supra,* 62 F.3d 1108, 1114.)

Under the FEHA (and the ADA) an employer is relieved of the duty to reassign a disabled employee whose limitations cannot be reasonably accommodated in his or her current job only if reassignment would impose an "undue hardship" on its operations or if there is no vacant position for which the employee is qualified.

Respondent has never claimed it would be an "undue hardship" to reassign appellant to another position, though it appears to have done no more than advise her to apply for such positions; and there is at least a triable issue of fact as to whether positions for which appellant was qualified were available when, on June 30, 1995, she first conveyed to Gera Vaz her need for reassignment due to the physical difficulties she was having performing her current job, or thereafter, when she renewed her request to Vaz and made similar requests of Lynn Hogarth, Pat Zabell and others.[4] In February 1996 appellant applied for the position of corporate employment specialist, but was subsequently informed that the job "had been put on hold." In the spring of 1996 she applied for an "MIS System Analyst" job and a "Store Operations/Special Projects" job, but was turned down for both positions. Appellant states she made no formal applications for corporate positions after May 1996 because she was told by Gera Vaz simply to let the managers of the departments to which she was willing to transfer to know of her interest. She

---

[4]We do not think it relevant whether a position existed in the Hayward Call Center when appellant inquired of John Duken about a position there, because on the basis of medical advice appellant felt such a position would not accommodate her disability due to the necessity of a long commute.

claims she did so commencing in May 1996 but was never informed of an available position. For a period of time, appellant checked respondent's telephone job listings, as directed, but eventually stopped doing so because the jobs listed mainly clerical, and low-level administrative jobs and also because she was relying on the promises of various department managers to find her a suitable position.

Respondent's evidence does not establish that vacant positions for which appellant was qualified did not exist between June 1995, when she first sought reassignment as a necessary accommodation, and March 1998, when she left the company. On the contrary, the deposition testimony of Gera Vaz, respondent's vice-president of human relations, and that of Lynne Wright and Carla Crowley Earl, associate relations managers, suggest that positions as associate relations manager or corporate trainer, for which appellant was apparently qualified, may have been available in 1996 and 1997 but she was never told of the availability of such positions, which were given to other employees. The record does not adequately establish whether all of those who received these positions were as qualified as or better qualified than appellant. Appellant also provided evidence indicating that the corporate position of store manager trainer, which respondent indicated might be provided appellant (albeit in Nov. 1997, after appellant was represented by legal counsel) was identical to positions available much earlier but never made known to her despite her requests for such information.

Because there are triable issues of fact as to whether respondent knew it had not reasonably accommodated appellant's limitations by restructuring her job and, if so, whether suitable positions to which she could have been reassigned were available when respondent learned that the restructuring of appellant's job failed to reasonably accommodate, the grant of summary judgment on appellant's first cause of action was error.

## IV., V.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

For the foregoing reasons, we conclude that summary judgment was improperly granted in respondent's favor on appellant's claim of failure to reasonably accommodate. We also conclude that summary relief was properly granted respondent on appellant's cause of action for retaliation, and that appellant's claim for punitive damages was properly disallowed.

*See footnote, *ante,* page 1376.

Accordingly, the judgment in respondent's favor on appellant's cause of action for failure to reasonably accommodate is reversed. The judgment is affirmed in all other respects. The parties are to bear their own costs on appeal.

Haerle, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied May 25, 2000.